1   Eric B. Fastiff (State Bar No. 182260)
    Brendan P. Glackin (State Bar No. 199643)
2   RoseMarie Maliekel (State Bar No. 276036)
    LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
3   275 Battery Street, 29th Floor
    San Francisco, CA 94111-3339
4   Telephone: (415) 956-1000
    Facsimile: (415) 956-1008
5
    Dan Drachler
6   ZWERLING, SCHACHTER & ZWERLING, LLP
    1904 Third Avenue, Suite 1030
7   Seattle, WA 98101
    Telephone: (206) 223-2053
8   Facsimile: (206) 343-9636

9   ***Counsel for Plaintiffs Breanna Jackson, Gloria
    Goldblatt, and the Proposed Class***
10
                    UNITED STATES DISTRICT COURT
11
                  NORTHERN DISTRICT OF CALIFORNIA
12

13
    BREANNA JACKSON, and GLORIA         Civil Action No._____
14  GOLDBLATT, individually and on behalf
    of all others similarly situated,
15
              Plaintiffs,              **CLASS ACTION COMPLAINT**
16
    v.                                 **JURY TRIAL DEMANDED**
17
    AMERICAN AIRLINES, INC.;
18  AMERICAN AIRLINES GROUP INC.;
    DELTA AIR LINES, INC.; SOUTHWEST
19  AIRLINES CO.; UNITED
    CONTINENTAL HOLDINGS, INC.; and
20  UNITED AIRLINES, INC.,

21            Defendants.

22

23

24

25

26

27

28

Plaintiffs Breanna Jackson and Gloria Goldblatt, individually and on behalf of a class of all those similarly situated ("Class"), complain against defendants American Airlines, Inc.; American Airlines Group Inc.; Delta Air Lines, Inc.; Southwest Airlines Co.; United Continental Holdings, Inc.; and United Airlines, Inc. (collectively, "Defendants"), and allege on information and belief as follows:

## I. SUMMARY OF THE ACTION

1.      Defendants operate the four largest domestic United States airline carriers that collectively account for over 80 percent of all domestic airline travel.  For years, Defendants have colluded to restrain capacity and increase the price of domestic airline airfares in violation of the Sherman Act, 15 U.S.C. § 1.  Defendants agreed to restrict and control capacity, known within the industry as "capacity discipline." Defendants communicated with each other regarding plans to stabilize or restrict capacity and agreed with each other to control and monitor capacity in an effort to maintain domestic airline ticket prices at supra-competitive levels.

2.      These Defendants even restrict competing against each other for certain routes. For example, United Airlines is ending service at New York's JFK Airport in October 2015, and moving flights to Newark Liberty International Airport.  Delta Airlines will acquire United's 17 slots at JFK, and United will get Delta's slots at Newark.  Rather than compete, airlines are instead aligning their services so as to avoid competition.

## II. JURISDICTION, VENUE, AND COMMERCE

3.      The Court has jurisdiction over the instant matter pursuant to 28 U.S.C. § 1332(d) and the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1711, *et seq.*, which vest original jurisdiction in the district courts of the United States for any multi-state class action where the aggregate amount in controversy exceeds $5 million and where the citizenship of any member of the class of plaintiffs is different from that of any defendant.  The $5 million amount-in controversy and diverse-citizenship requirements of CAFA are satisfied in this case.

4.      Venue is appropriate in the Northern District of California under 28 U.S.C. §§ 1391(b) and (c) because, during the Class Period, many of the Defendants transacted business,

- 1 -

1   were found, or had agents in this District and because a substantial portion of the affected

2   interstate trade and commerce described below has been carried out in this District.

3        5.      The Court has personal jurisdiction over each Defendant because, among other

4   things, each Defendant:

5              (a)      transacted business throughout the United States, including in this District;

6              (b)      participated in the sale and distribution of airline tickets throughout the

7   United States, including in this District;

8              (c)      had substantial contacts with the United States, including in this District;

9   and/or

10             (d)      was engaged in an illegal conspiracy that was directed at and had the

11  intended effect of causing injury to persons residing in, located in, or doing business throughout

12  the United States, including in this District.

13       6.      Defendants engaged in conduct that caused direct, substantial, and reasonably

14  foreseeable and intended anticompetitive effects upon interstate commerce within the United

15  States.

16       7.      Defendants' and their co-conspirators' activities were within the flow of, were

17  intended to, and did have, a substantial effect on interstate commerce of the United States.

18  Defendants' products are sold in the flow of interstate commerce.

19       8.      By reason of the unlawful activities alleged herein, Defendants substantially

20  affected commerce throughout the United States, causing injury to Plaintiffs and Class Members.

21  Defendants, directly and through their agents, engaged in a conspiracy affecting all states to fix or

22  inflate prices of airline tickets that unreasonably restrained trade and adversely affected the

23  market for airline transportation services.

24       9.      Defendants' conspiracy and wrongdoing described herein adversely affected

25  persons in the United States who purchased airline tickets for personal use and not for resale,

26  including Plaintiffs and Class Members.

27

28

10. **Intradistrict Assignment:** Assignment to the San Francisco or Oakland Division of the Court is proper pursuant to Northern District of California Local Rule 3-2(d) because a substantial part of the events giving rise to the claims arose in the counties enumerated therein.

## III.   PARTIES

### A.   Plaintiffs

11.   Plaintiff Breanna Jackson is a resident of the State of California.  During the Class Period, Ms. Jackson purchased air passenger transportation directly from Delta Airlines and has suffered injury to her business or property as a result of the Defendants' illegal conduct.

12.   Plaintiff Gloria Goldblatt is a resident of the State of California.  During the Class Period, Ms. Goldblatt purchased air passenger transportation directly from Delta Airlines, United Airlines, and Southwest Airlines and has suffered injury to her business or property as a result of the Defendants' illegal conduct.

### B.   Defendants

#### 1.   American Airlines

13.   Defendant American Airlines Group Inc. is a holding company and the parent company of Defendant American Airlines, Inc.  Both American Airlines Group Inc. and American Airlines, Inc. (together, "American") are Delaware corporations with their principal places of business located in Fort Worth, Texas.

14.   American was formed in December 2013 as a result of the merger of AMR Corporation, the previous parent company of American Airlines, and US Airways Group, the previous parent company of US Airways.  The new American (consisting of American, American Eagle, US Airways, and US Airways Express) is the largest airline in the world, operating nearly 6,700 flights per day to 339 destinations in 54 countries.

#### 2.   Delta Air Lines

15.   Defendant Delta Air Lines, Inc. ("Delta") is a Delaware corporation with its principal place of business located in Atlanta, Georgia.  Delta operates more than 5,400 flights per day to 326 locations in 64 countries.

3.      **Southwest Airlines**

16.     Defendant Southwest Airlines Co. ("Southwest") is a Texas corporation with its principal place of business located in Dallas, Texas.  Southwest carries the most domestic passengers of any U.S. airline.  It operates more than 3,600 flights per day to 94 locations in the United States and six additional countries.

4.      **United Airlines**

17.     Defendant United Continental Holdings, Inc. is a holding company and the parent company of Defendant United Airlines, Inc.  Both United Continental Holdings, Inc. and United Airlines, Inc. (together, "United") are Delaware corporations with their principal places of business located in Chicago, Illinois.  United operates more than 5,300 flights per day to 369 locations.

18.     The acts taken by Defendants, as alleged herein, were authorized, ordered, and condoned by their respective parent companies and authorized, ordered and performed by their officers, directors, agents, employees, or representatives while engaged in the management, direction, control, or transaction of their business affairs.

19.     Various other persons, corporations, or firms not named as Defendants herein may have participated in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

**IV.     AGENTS AND CO-CONSPIRATORS**

20.     Other entities and individuals, at least some of which are unknown to Plaintiffs at this time, participated as co-conspirators and performed acts in furtherance thereof.  Plaintiffs believe co-conspirator identities can be ascertained through Defendants' records.

21.     Whenever reference is made to any act, deed, or transaction of any corporation or partnership, the allegation means that the corporation or partnership engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, representatives, parent, predecessors, or successors-in-interest while they were actually engaged in the management, direction, control, or transaction of business or affairs or affairs of the corporation or partnership.

22.     Plaintiffs reserve the right to name some or all agents and co-conspirators as Defendants at a later date.

## V.     FACTUAL ALLEGATIONS

### A.     Characteristics of the domestic airline industry that facilitate collusion.

23.     The structure and characteristics of the domestic airline industry have facilitated collusion.

24.     **The market is highly concentrated.** A concentrated market environment is defined by a lack of competition, whereby the majority of the market is controlled by a minority of organizations.  The four Defendant airlines took in a combined $140.4 billion in 2014 and control 80% of the domestic market. The market concentration extends to individual routes, 97% of which have an HHI measure greater than 2,500, which the DOJ defines as "highly concentrated."

| HHI Range | Routes | Passengers |
|---|---|---|
| 5,000 – 10,000 | 36.5% | 23.0% |
| 4,000 – 5,000 | 21.0% | 17.7% |
| 2,500 – 4,000 | 39.3% | 49.2% |
| 1,800 – 2,500 | 3.1% | 10.1% |
| <= 1,800 | 0.0% | 0.0% |
| Total Routes and Passengers | 3,144 | 8,588,793 |

Source: Bureau of Transportation, http://www.transtats.bts.gov/Data_Elements.aspx?Data=3

25.     **There are high barriers to entry.**  High barriers to entry make it more difficult for competing organizations to break into the market, thereby protecting a concentrated and anticompetitive market.  The airline industry has enormous capital costs, regulations that limit the number of takeoffs/landings at each airport (slots), and long-term exclusive use leases at gates. Slots are highly-prized and rarely change hands and are therefore very expensive, costing on average $2 million each.

**B.     DOJ Investigation**

26.     On July 1, 2015 the Associated Press reported that Defendants are being probed by the Department of Justice for potentially price-fixing airfares.  In particular, the DOJ has subpoenaed each Defendant airline for information from January 2010 to present on:

- All communications among the four airlines.
- All communication between the airlines, stock analysts, and major shareholders regarding capacity.
- Discussions within and among the airlines about the "the undesirability of your company or any other airline increasing capacity."
- Data on passenger-carrying capacity by region.

27.     The DOJ probe appears to have been prompted by a *New York Times* article that described how Southwest reduced its planned 2015 capacity expansion from 8% to 7% after pressure from competitors at an International Air Transport Association (IATA) conference. IATA is the trade association for the world's airlines, representing 260 airlines or 83% of total air traffic.  James B. Stewart, "'Discipline' for Airlines, Pain for Fliers," *N.Y. Times*, June 11, 2015.

28.     On May 20, 2015 Gary C. Kelly ("Kelly"), the CEO of Southwest, announced a break in the industry's commitment to maintaining "capacity discipline," disclosing that Southwest intended to increase its capacity by as much as eight percent by acquiring two new gates at its hub at Love Field, Dallas.  This had an immediate and calamitous effect on the share prices of United, American and Delta.  "Understandably, investors are questioning if this signals the end of the era of industry capacity discipline," Raymond James analyst Savanthi Syth wrote in a research note.  Similarly, Wolfe Research airline analyst Hunter Keay said that "[d]omestic capacity discipline has effectively vanished."

29.     The other airlines decided they needed to take action.  On June 7-9, 2015, IATA held its Annual General Meeting in Miami, Florida.  Chief executives of many of the leading passenger airlines attended.  During that meeting, several of them spoke publicly about the need for "discipline" within the industry.  Delta's President, Ed Bastian, committed that Delta is "continuing with the discipline that the marketplace is expecting." American's chief executive,

1    Douglas Parker, stated that the airlines had learned their lessons from past price wars; "I think

2    everybody in the industry understands that." Air Canada's chief executive, Calin Rovinescu,

3    agreed, saying "People were undisciplined in the past, but they will be more disciplined this

4    time." As one commentator, James B. Stewart, observed in the June 11, 2015 *New York Times*

5    article, "'Discipline' is classic oligopoly-speak for limiting flights and seats, higher prices and

6    fatter profit margins.  This year, that discipline seems to be working: the I.A.T.A. projected this

7    week that airline industry profits would more than double this year to nearly $30 billion, a

8    record." The same article noted:

9            "When airline industry leaders say they're going to be disciplined,' they mean they

10           don't want anyone to expand capacity," said Fiona Scott Morton, professor of

11           economics at Yale and a former deputy attorney general in the antitrust division of

12           the Justice Department.  "And when there aren't enough seats, airlines raise prices.

13           That's what we've been seeing."

14       30.    These statements by airline executives and the pressure placed on Southwest at the

15   IATA Annual General Meeting had the desired effect.  *The New York Times* article cited above

16   reported that "after coming under fire at this week's conference, Southwest quickly moved to

17   reassure investors it isn't going rogue.  'We have taken steps this week to begin pulling down our

18   second half 2015 to manage our 2015 capacity growth, year-over-year, to approximately

19   7 percent,' Mr. Kelly said." It is clear that Southwest knuckled under to the collusive "discipline"

20   imposed by its competitors.

21       **C.    Signaling**

22       31.    The airlines have multiple means by which they have signaled and agreed on

23   pricing plans: (1) through the Airline Tariff Publishing Company (ATPCO), a real-time airfare

24   database and (2) through public discussions with investors.  The former strategy was previously

25   subject of a 1994 DOJ antitrust investigation and consent decree (now expired) while the latter

26   strategy appears to have been embraced by the airlines, as noted in the DOJ's 2013 Amended

27   Complaint regarding the American/US Airways merger.

28

CLASS ACTION COMPLAINT
CASE NO._____

32.     Both methods allow airlines to coordinate prices either directly or indirectly through capacity planning.

33.     The ability of the airlines to coordinate prices is apparent in the actual price data. According to the DOJ, airlines typically follow each other's price increases and punish non-compliers through "cross-market initiatives" that reduce fares in their most price-sensitive routes.[1]

34.     ATPCO, owned by the airlines, collects and distributes airfare and related data for its subscribers.  Airfare data is published throughout the day, as often as every hour, and is available by route.[2]  In 1994, the DOJ entered into a consent decree with ATPCO and eight airlines regarding their use of APTCO to signal future price increases.[3]  In particular, defendants were accused of using ATPCO to publish price increases with special footnotes that coded the effective date of the increase and relevant route information.  These proposed increases were then withdrawn if competitors didn't match them.  The consent decree was set to expire in August 2004, but the DOJ accused American Airlines of cheating and entered into a new settlement agreement that expired in August 2011.

35.     Defendants signaled their agreement to restrain capacity and increase prices by using public statements.  The following is only a partial list of the many public assurances given by Defendants to one another that they would not expand capacity and trigger a price war in any market:

### *2013 – US Airways*

(a)     In response to a question about "desired" industry change:  William Douglas Parker (Executive Chairman, Chief Executive Officer, Chairman of Labor Committee, Chairman of US Airways and Chairman of Awa): "All right, well, thanks, Jamie.  Look, we started – **several years ago, we started talking about all the things the industry needed**

---

[1] US and Plaintiff States v. US Airways Group and AMR Corp., Case 1:13-cv-01236-CKK.  Amended Complaint, pg.15-16.  http://www.justice.gov/atr/cases/f300400/300479.pdf

[2] http://atpco.net/life-cycle-fare and http://www.atpco.net/products/data-distribution-and-subscriptions

[3] See http://www.justice.gov/atr/cases/dir23.htm and also: http://www.colorado.edu/econ/courses/spring10-4999-003/ATPCO.pdf

1   **starting with consolidation.  Included on that list was management teams that care more**

2   **about returns than market share**."  US Airways Group Management Discusses Q4 2012

3   Results Earnings Call Transcript, January 23, 2013, 11:30 AM ET.  [emphasis added]

4              (b)      "Total domestic capacity is forecasted to be up 3.8%."  US Airways Group

5   Inc. (LCC) Management Discusses Q2 2013 Results Earnings Call Transcript, July 24, 2013,

6   12:30 PM ET.

7              (c)      "Our capacity guidance is consistent with what we gave in early October.

8   Total system capacity is expected to be up approximately 3.5% versus 2012 with domestic and

9   international capacity each forecast to be up approximately 3.5%."  US Airways Group

10  Management Discusses Q3 2013 Results Earnings Call Transcript, October 23, 2013, 12:30 PM

11  ET.

12             (d)      John D. Godyn (Morgan Stanley, Research Division): "Doug or Scott,

13  we've seen some examples in the -- **across the airlines of airlines sort of putting together a**

14  **strategy defined by very conservative capacity growth** and CapEx, generating a lot of cash and

15  returning that cash to shareholders.  You've sort of taken a little bit of a different strategy here

16  and it sounds like based on the 2014 capacity growth guidance, you're going to continue to

17  exceed the market in terms of growth.  I was just hoping to kind of hear your thoughts on this idea

18  in general.  Philosophically, I mean, what's the right strategy here, and does it depend on the scale

19  of the airline?" J. Scott Kirby (President): "First, it doesn't depend on the scale of the airline.  The

20  right philosophy -- **we've talked about capacity discipline for years**.  And capacity discipline to

21  us means growth when there are profitable growth opportunities, and it means capacity reductions

22  in a world where existing flying loses money.  That's typically happened in 1 of 2 ways, either a

23  spike in fuel price, which causes a flight -- causes a series of flights that you have that were

24  formerly marginally profitable become unprofitable because fuel prices have spiked, or it happens

25  like it happened in 2009 where domestic revenues declined by 17%.  And so you had flights again

26  that were formerly profitable that became unprofitable.  So we always look at the world from our

27  individual airlines perspective."  US Airways Group Management Discusses Q3 2013 Results

28  Earnings Call Transcript, October 23, 2013. 12:30 PM ET. [emphasis added]

CLASS ACTION COMPLAINT
CASE NO._____

*2014 – Southwest Airlines*

(e) "**However, we intend to keep our capacity for the year relatively flat on a year-over-year basis.**"  Southwest Airlines Management Discusses Q4 2013 Results Earnings Call Transcript, January 23, 2014, 11:30 AM ET.

(f) Tammy Romo (Chief Financial Officer and Senior Vice President of Finance): "Jamie, yes, the 2% to 3% is based on our current -- our contracts, our current contracts with labor.  So no, it does not include any accruals.  On our capacity, yes, I just mentioned during my remarks that **we expect our capacity – maintain capacity relatively flat in that guidance. That's our intention pretty much throughout the year for -- we've got our schedule published out through June.**"  Southwest Airlines Management Discusses Q4 2013 Results Earnings Call Transcript, January 23, 2014, 11:30 AM ET.  [emphasis added]

*2014 – American Airlines*

(g) Scott Kirby (President): "Well, **we don't plan to grow capacity** because fuel price has declined and we have been in this industry long enough to know that that can turn in a hurry.  And so going and buying 20 year life assets based on today's fuel price is probably not the best decision to make.  **So we don't plan to do anything about increasing capacity.**"  American Airlines Group (AAL) Earnings Report: Q3 2014 Conference Call Transcript, October 23, 2014, 01:30 PM ET.

*2015 – Delta Airlines*

(h) Richard Anderson (CEO): "We will use the decline in fuel prices as an opportunity to accelerate progress towards our long term goals.  Fuel will remain volatile in 2015. **We are not making any changes to our 2015 capacity plan in light of the lower fuel prices**. In fact, we continue to trim capacity on the margin to maintain yields and our RASM premium. Between fuel savings and the benefits of our revenue initiatives, we expect to produce a significant pretax profit increase in 2015."  Delta Airlines' (DAL) CEO Richard Anderson on Q4 2014 Earnings Results Earnings Call Transcript, Conference Call January 20, 2015, 10:00 AM ET.  [emphasis added]

(i)      Richard Anderson (CEO): "Capacity growth will be about 5% but just 3% net of last year's weather.  With fewer airplanes and fewer departures with revenues growing 7% fuel savings will go to the bottom line which will set up for a very strong 1Q and these trends in 1Q bode well for all of 2015."  Delta Airlines' (DAL) CEO Richard Anderson on Q4 2014 Earnings Results Earnings Call Transcript, Conference Call January 20, 2015, 10:00 AM ET.

(j)      Edward H. Bastian (President): "In the domestic market demand and revenues remain solid.  We are forecasting our March quarter revenues to increase about 7% with RASM roughly flat on 5% higher capacity.  That forecast includes about a point of unit revenue pressure and two points of capacity growth from last year's winter storm so schedule-over-schedule our capacity will be up roughly 3%."  Delta Airlines' (DAL) CEO Richard Anderson on Q4 2014 Earnings Results Earnings Call Transcript, Conference Call January 20, 2015, 10:00 AM ET.

(k)      Edward H. Bastian (President): "**While we will make incremental capacity additions in New York, Seattle, and Los Angeles this year**, we are also focused on tactically adjusting the gauge and frequency of flying to better match demand including, **deciding this week to take 1.5 points out of our domestic schedule starting in March**."  Delta Airlines' (DAL) CEO Richard Anderson on Q4 2014 Earnings Results Earnings Call Transcript, Conference Call January 20, 2015, 10:00 AM ET.  [emphasis added]

(l)      William Greene (Morgan Stanley): "So, insofar as fuel went back up you wouldn't need to make any adjustments I assume, or is that not the right way to think about it?"  Richard H. Anderson (Chief Executive Officer): "Well, if fuel goes back up remember, **it takes a lot to make a capacity adjustments at an airline of this size.  We have 12,000 airplanes so 1% of 12,000 airplanes is 12 airplanes, there's eight crews per airplane.  You've got to get all those people hired, and trained, and the flight attendants, and we tend to be on the conservative side, because we don't want to over shoot on capacity or expense because if you're adding fixed expense you better be certain you're going to get a return on it**.  So, bottom line is it's always a really conservative approach to how you plan and you should always plan with fuel prices high.  We've seen this movie many times in the industry and so you've got

1  to run the company conservatively and we're trimming capacity as we speak as we get close into

2  the beginning of the second quarter."  Delta Airlines' (DAL) CEO Richard Anderson on Q4 2014

3  Earnings Results Earnings Call Transcript, Conference Call January 20, 2015, 10:00 AM ET.

4  [emphasis added]

5         *2015 – Southwest Airlines*

6         (m)    Jack Nicas (Wall Street Journal): "**Some investors have speculated and**

7  **feared in some cases that the windfall from cheaper fuel would lead to airlines to add**

8  **capacity and lower fares**.  So would your potential $1.7 billion in fuel savings this year change

9  your thinking at all on pricing going forward particularly in some of your newer and/or more

10  competitive markets?" Gary Kelly (Chairman, President & CEO): ". . . .**With respect to our**

11  **capacity plans again, I think we've been very clear this morning to say that we're really not**

12  **changing our business plan for 2015 with respect to those kinds of topics**....  I'm sure when

13  we get to this fall if we are convinced that we're in for a low energy prices for a while we'll

14  revisit 2016, 2017 opportunities.  But even with that, I don't think that we will want to do

15  anything that is materially different than the plans we've already laid out.  So yes, we might grow

16  a little bit more after this year, if we are so fortunate that we end up with more cash than we had

17  planned we'll consider the alternatives that we have to put that cash to good use."  Southwest

18  Airlines' CEO Gary Kelly on Q4 2014 Results Earnings Call Transcript, Conference Call January

19  22, 2015, 12:30 ET.  [emphasis added]

20         *2015 – American Airlines*

21         (n)    **"There has been a lot of talk of capacity changes in response to lower**

22  **fuel price.  You won't see any changes from us in the near future since we continue to run**

23  **the airline as though high fuel prices will return**."  American Airlines' (AAL) CEO Doug

24  Parker on Q4 2014 Results Earnings Call Transcript, Conference Call January 27, 2015, 8:30 AM

25  ET.  [emphasis added].

26         (o)    Thomas Kim (Goldman Sachs): "As you reduce capacity, where does that

27  incremental capacity go within the system?" Scott Kirby (President): "We wound up - we in 2015

28  have retired more airplanes than we originally planned to."  American Airlines' (AAL) CEO

- 12 -

1    Doug Parker on Q4 2014 Results Earnings Call Transcript, Conference Call January 27, 2015,

2    8:30 AM ET.

3            36.      Using these fora to enforce capacity discipline has been embraced by at least one

4    airline executive, as described by the DOJ's 2013 Amended Complaint regarding American/US

5    Airways:

6                    US Airways' senior management debated over email about how
                     best to get the rival airline's attention and bring it back in line with
7                    the rest of the industry.  In that email thread, **US Airways' CEO
                     urged the other executives to "portray[ ] these guys as idiots to
8                    Wall Street and anyone else who'll listen."**  Ultimately, to make
                     sure the message was received, US Airways' CEO forwarded the
9                    email chain—and its candid discussion about how aggressive
                     competition would be bad for the industry—directly to the CEO of
10                   the rival airline.  (The rival's CEO immediately responded that it
                     was an inappropriate communication that he was referring to his
11                   general counsel.)[4]

12           37.      Furthermore, the airlines' various claims that capacity has to be rigid is belied by

13   their pride in their ability to vary capacity to their advantage.  For example, US Airways president

14   J. Scott Kirby noted in 2012 that:

15                   the industry's gotten much better at off demand.  We've done that.
                     One of the best place that the industry's done that is by varying
16                   capacity, **much more variability in our capacity across the
                     industry than there has been historically**.  At US Airways, we do
17                   something called a flux schedule…we fly 8% fewer seats than we
                     do in the second half of December.  So we do that.  **The whole
18                   industry has gotten much better at varying capacity in a much
                     more tactical manner**.[5]  [emphasis added]

19

20           **D.      Potential magnitude of manipulation.**

             38.      Three empirical studies examining the effect of competition and airline prices are
21
     summarized below.
22
             39.      **Prices are 26% - 33% lower when Southwest competes with major carriers**.
23
     Using airfare data available from the U.S. Department of Transportation's Bureau of
24
     Transportation,[6] from 2007-2008, Bruckner, Lee, and Singer examine the effect on airfares when
25

26   _____

     [4] US and Plaintiff States v.US Airways Group and AMR Corp., Case 1:13-cv-01236-CKK.  Amended Complaint,
27   pg.17.  http://www.justice.gov/atr/cases/f300400/300479.pdf
     [5] US Airways Earning call, 2012 Q4.
28   [6] http://www.transtats.bts.gov/DL_SelectFields.asp?Table_ID=247

low cost carriers, such as Southwest, compete in markets once dominated by legacy carriers.[7]
They found that fares decrease by 26% - 33% when Southwest is a competitor on a non-stop route
in the same or nearby city, and by 12% - 17% when other low-cost carriers are competitors.  If
Southwest, target of the DOJ probe, is colluding with legacy carriers to fix airfares, the price
effect could be as high as 26% - 33%.

40.     **Prices increased following American – US Airways merger**.  A study by
Charles River Associates ("CRA") examined airline behavior to limit booking through online fare
comparison websites and the effect of the American – US Airways merger in 2013.[8]  Using 2014
data, the study found that airfares on routes where the merged entity had substantial overlap
increased by an average of 8.1% compared to the 3.9% increase on routes where American and
US Airways had not previously competed.  Price-fixing cartels tend to mimic, to some degree, the
behavior of a single dominant firm.  This study of the American – US Airways merger shows the
potential effect of a price-fixing cartel that resulted in a further diminishment of competition.

41.     **Airfares decoupled from fuel prices in 2014.**  The CRA study and the
Associated Press both report that airfares have increased even though fuel prices have decreased
substantially in 2014.  In particular, the CRA study notes that the average airfare increased by
0.5% in 2014 but the cost of jet fuel decreased by 24% over the same period.[9]  Similarly, the
Associated Press notes that nationally, average airfares increased by 13% 2009-2014 even as jet
fuel costs decreased throughout 2014.

42.     And, contrary to expectations in a competitive market the average price for air
travel in the US has increased by 19.5% from post-crisis low in 2009 to present.

## VII.   CLASS ALLEGATIONS

43.     Plaintiffs brings this action on behalf of themselves and, under Federal Rule of
Civil Procedure 23(a) and (b)(3), as representative of a Class defined as follows:

All persons and entities who purchased domestic airline tickets

---

[7] "Airline competition and domestic US airfares," Brueckner, Lee, Singer. *Economics of Transportation* 2013, pg.1–17.
[8] "Benefits of Preserving Consumers' Ability to Compare Airline Fares", Morton, Romain, and Graf, 2015.
[9] Morton at 53.

directly from one or more Defendants from July 2, 2011 to the present (the "Class Period"). Excluded from the Class are government entities, Defendants, any subsidiaries or affiliates of Defendants, and any of Defendants' co-conspirators, whether or not named as a Defendant in this Complaint, and any judges or justices assigned to hear any aspect of this action.

44.     Members of the Class are so numerous and geographically dispersed that joinder is impracticable.

45.     Further, the Class is readily identifiable from information and records in the possession of Defendants.

46.     Plaintiffs' claims are typical of the claims of the members of the Class.

47.     Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Defendants, *i.e.*, they paid supra-competitive prices for airline passenger tickets.

48.     Plaintiffs will fairly and adequately protect and represent the interests of the Class.

49.     The interests of the Plaintiffs are coincident with, and not antagonistic to, those of the Class.

50.     Plaintiffs are represented by counsel with experience in the prosecution of class action antitrust litigation, and with particular experience with class action antitrust litigation.

51.     Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members because Defendants have acted on grounds generally applicable to the entire Class, thereby making overcharge damages with respect to the Class as a whole appropriate.

52.     Questions of law and fact common to the Class include, but are not limited to:

(a)     Whether Defendants engaged in restraints of trade;

(b)     Whether Defendants engaged in agreements not to compete;

(c)     Whether and the extent to which Plaintiffs and members of the Class have been injured as a result of Defendants' violations of law;

(d)     Whether declaratory or injunctive relief from Defendants' continuing violations of law is warranted, and, if so, the nature and scope of any such relief.

CLASS ACTION COMPLAINT
CASE NO._____

1    53.    Class action treatment is a superior method for the fair and efficient adjudication

2  of the controversy.

3    54.    Such treatment will permit a large number of similarly situated persons to

4  prosecute their common claims in a single forum simultaneously, efficiently, and without the

5  unnecessary duplication of evidence, effort, or expense that numerous individual actions would

6  engender.

7    55.    The benefits of proceeding through the class mechanism, including providing

8  injured persons or entities a method for obtaining redress on claims that could not practicably be

9  pursued individually, substantially outweighs potential difficulties in management of this class

10  action.

11    56.    Plaintiffs know of no special difficulty to be encountered in the maintenance of

12  this action that would preclude its maintenance as a class action.

13  **VIII.    CLAIM FOR RELIEF**

14  **Violation of the Sherman Act, 15 U.S.C. § 1**

15    57.    Plaintiffs incorporate by reference and re-allege the preceding allegations as

16  though fully set forth herein.

17    58.    During the Class Period, Defendants have engaged and continue to engage in

18  continuing agreements, contracts, or combinations to artificially raise, fix, maintain, and

19  otherwise stabilize the price of domestic air transportation in violation of Section 1 of the

20  Sherman Act, 15 U.S.C. § 1.

21    59.    In carrying out their agreement, Defendants engaged in anticompetitive acts, the

22  purpose and effect of which were to artificially raise, fix, maintain, and stabilize the price of

23  domestic air transportation.

24    60.    Defendants' illegal acts had at least the following effects:

25        (a)    Plaintiff and members of the Class paid Defendants higher prices than they

26  otherwise would have for domestic air transportation;

27        (b)    Plaintiff and members of the Class were deprived of free, fair, and open

28  competition for domestic air transportation; and

1          (c)      Competition in the market for domestic air transportation was restrained,

2     suppressed, or eliminated.

3          61.     Plaintiffs and members of the Class have been injured in their business and

4     property by reason of Defendants' violation of section 1 of the Sherman Antitrust Act, 15 U.S.C.

5     § 1, within the meaning of section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

6     **IX.     PRAYER FOR RELIEF**

7          62.     Plaintiffs and Class members pray for relief as set forth below:

8          (a)      Certification of the action as a class action pursuant to Federal Rule of

9     Civil Procedure 23, and appointment of Plaintiffs as Class Representatives and their counsel of

10    record as Class Counsel;

11         (b)      A declaration that Defendants' conduct constituted an unlawful restraint of

12    trade in violation of the state statutes alleged herein and that Defendants are liable for the conduct

13    or damage inflicted by any other co-conspirator.

14         (c)      Restitution and/or damages to Class members for their purchases of

15    Defendants' airline tickets at inflated prices;

16         (d)      Actual damages, statutory damages, punitive or treble damages, and such

17    other relief as provided by the statutes cited herein;

18         (e)      Pre-judgment and post-judgment interest on such monetary relief;

19         (f)      Equitable relief in the form of restitution and/or disgorgement of all

20    unlawful or illegal profits received by Defendants as a result of the anti-competitive conduct

21    alleged herein;

22         (g)      The costs of bringing this suit, including reasonable attorneys' fees; and

23         (h)      All other relief to which Plaintiffs and Class members may be entitled at

24    law or in equity.

25    **X.     DEMAND FOR JURY TRIAL**

26         Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs on behalf of themselves and the

27    proposed Class demand a trial by jury on all issues so triable.

28

1267785.1                                - 17 -                    CLASS ACTION COMPLAINT
                                                                   CASE NO._____

1

2       Dated: July 30, 2015                By: */s/ Eric B. Fastiff*
                                                Eric B. Fastiff
3
                                            Eric B. Fastiff (State Bar No.182260)
4                                           Brendan P. Glackin (State Bar No.199643)
                                            Lin Y. Chan (State Bar No.255027)
5                                           LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                            275 Battery Street, 29th Floor
6                                           San Francisco, CA 94111-3339
                                            Telephone: (415) 956-1000
7                                           Facsimile: (415) 956-1008

8                                           By: */s/ Dan Drachler*
                                                Dan Drachler
9
                                            Dan Drachler
10                                          ZWERLING, SCHACHTER & ZWERLING, LLP
                                            1904 Third Avenue, Suite 1030
11                                          Seattle, WA 98101
                                            Telephone: (206) 223-2053
12                                          Facsimile: (206) 343-9636

13                                          Robert S. Schachter
                                            Ana Maria Cabassa
14                                          ZWERLING, SCHACHTER & ZWERLING, LLP
                                            41 Madison Avenue
15                                          New York, NY  10010
                                            Telephone:  (212) 223-3900
16                                          Facsimile:   (212) 371-5969

17                                          ***Counsel for Plaintiffs Breanna Jackson, Gloria
                                            Goldblatt, and the Proposed Class***
18

19

20

21

22

23

24

25

26

27

28

1267785.1                          - 18 -                   CLASS ACTION COMPLAINT
                                                            CASE NO._____